IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| NXP USA, INC., § <br> § <br> Plaintiff § <br> § <br> v. § <br> § <br> PTW AMERICA, LLC, PTW ASIA PTE § <br> LTD., and MLS CORP., § <br> § <br> Defendants § | Civil Action No. 1:25-cv-1086 <br><br> JURY TRIAL DEMANDED |

### PLAINTIFF NXP USA INC.'S COMPLAINT

Plaintiff NXP USA, Inc. ("NXP") files this Complaint and would respectfully show the Court the following:

#### I.   INTRODUCTION

This case concerns millions of dollars in damages owed to NXP because the affiliated companies comprising the PTW Group and MLS Corp. and its affiliates failed to purchase NXP's highly specialized, used semiconductor manufacturing equipment.  Defendants PTW and MLS devised a plan whereby PTW would acquire the equipment from NXP using MLS funds and then immediately transfer the equipment to MLS.  But after PTW secured the winning bid and executed the purchase agreement with NXP, MLS breached its deal with PTW, refusing to fund the transaction.  Not willing to purchase the equipment with its own funds, PTW decided instead to breach its contract with NXP, hoping that NXP could find another buyer that would mitigate NXP's damages against it.  NXP now seeks herein the benefit of its bargain against both PTW and MLS.

## II.     PARTIES

1. Plaintiff NXP USA Inc. is a Delaware corporation with its principal place of business in Austin, Texas.

2. Defendant PTW America, LLC ("PTW America") is a Texas limited liability company whose sole member is PTW Asia Pte Ltd., a foreign company with its principal place of business in Singapore.  PTW America may be served through its registered agent for service of process.

3. Defendant PTW Asia Pte Ltd. ("PTW Asia") is a foreign company with its principal place of business at 6 Tagore Dr, #02-I7 Tagore Building, Singapore 787623.  PTW Asia was established in Singapore to expand its support to all semiconductor and photonic factories worldwide.  It maintains branch offices and refurbishment centers in America, Europe, the UK, Taiwan, Malaysia, Korea, Japan and China.  PTW Asia may be served pursuant to the provisions of the Hague Convention.

4. MLS Corp. ("MLS") is a foreign company registered under the laws of South Korea with its principal place of business at 30, Hanilro 23 beongil, Giheunggo, Gyeonggido, South Korea 17099.  MLS may be served pursuant to the provisions of the Hague Convention.

## III.     JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because the suit is between Plaintiff NXP, a citizen of a U.S. state, and Defendants PTW America, PTW Asia, and MLS, each of which is a citizen of a foreign country who is not a lawfully admitted permanent U.S. resident domiciled in the same U.S. state as Plaintiff NXP, and the amount in controversy exceeds $75,000, excluding interest and costs.

6. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, which is where a substantial part of the property that is the subject of the action is situated, and because Defendants are subject to personal jurisdiction here.

## IV. FACTUAL BACKGROUND

7. NXP owns and operates two semiconductor manufacturing facilities in Austin, Texas.

8. In or about 2022, NXP decided to upgrade its manufacturing equipment at one of those facilities, known as the Oak Hill Fab. Because there is a market for used semiconductor equipment, NXP undertook a process to auction the equipment being replaced. The winning buyer would accept the equipment in waves, coinciding with the delivery and installation of the new equipment.

9. PTW America and PTW Asia (collectively, "PTW") are part of a number of affiliated entities around the world operating under, and holding themselves out as, the "PTW Group."

10. PTW Asia is the sole member and thus sole owner of PTW America.

11. By information and belief, PTW Asia and PTW America share directors and executives.

12. By information and belief, PTW Asia and PTW America share employees.

13. PTW Asia and PTW America share email and phone contact information.

14. Both PTW America and PTW Asia use the same "PTW Group" logo, letterhead, e-mail addresses and e-mail domain (www.ptwgroup.com).

15. PTW America's website at ptwamerica.com redirects to another PTW Group entity website.

16. PTW Group marketing is done in the single tense such that a customer would be led to believe there is one entity providing the services. For example, its website has a section discussing "our company," discussing "PTW's history," and the PTW Group seeks to be "your partner" for legacy tool support. The "About" section website lists "PTW Worldwide Locations," with PTW America listed in the United States and PTW Asia listed in Singapore.

17. All of the PTW companies within the PTW Group are affiliates of one another and operate with the singular purpose of supporting semiconductor companies worldwide, including by acquiring and reselling used semiconductor equipment.

18. PTW participated in NXP's auction process and was selected as the buyer.

19. NXP ultimately became aware that PTW was acting on behalf of MLS, the ultimate purchaser of the equipment.

20. On July 21, 2023, PTW signed a Master Used Equipment Sales Agreement with NXP (the "NXP Agreement"), attached hereto as Exhibit "A."

21. The terms of the NXP Agreement are incorporated herein as if fully restated.

22. The purchase price for the approximately 480 pieces of equipment being sold was $147,549,225.00.

23. The "Buyer" in the NXP Agreement is defined as "PTW America LLC, acting on behalf of itself and its Affiliates." Affiliates is broadly defined as follows:

> **"Affiliate"** means with respect to a Party, any corporation or other legal entity that now or hereafter Controls, is Controlled by, or is under common Control with such Party for only so long as such Control exists; where **"Control"** means the direct or indirect beneficial ownership of greater than fifty percent (>50%) of the shares of voting stock or equity interests to vote for the election of directors, or the power to direct or appoint the management, in another person or entity.

24. This broad definition encompasses all members of the PTW Group, including PTW America and PTW Asia.

25. Specifically, pursuant to the NXP Agreement's definition of "Affiliate," PTW America is affiliated with PTW Asia.

26. Accordingly, PTW America committed itself and all of its affiliates, including its sole owner PTW Asia, and all other members of the PTW Group, to purchase and pay for the equipment at issue in accordance with the terms and conditions of the NXP Agreement.

27. PTW America had the actual or apparent authority to make this commitment and was an agent of all members of the PTW Group, including PTW Asia.

28. Each piece of equipment was separately valued in the NXP Agreement.

29. PTW was required to make a downpayment of 10% of the entire purchase price ($14.75 million) no later than August 18, 2023.

30. PTW would then pay for each piece of equipment as it became available for removal from the Oak Hill Fab.

31. For PTW, the real purpose of the NXP transaction was to purchase the equipment for MLS.

32. Accordingly, on the day after PTW signed the NXP Agreement, it signed a Master Used Equipment Sales Agreement with MLS (the "MLS Agreement"), attached hereto as Exhibit "B."

33. The terms of the MLS Agreement are incorporated herein as if fully restated.

34. The "Buyer" in the MLS Agreement is "MLS Co., acting on behalf of itself and its Affiliates" and the "Seller" is "PTW America LLC, acting on behalf of itself and its Affiliates." The definition of "Affiliates" is identical to the one used in the NXP Agreement.

35. In other words, PTW America committed itself and all of its affiliates, including PTW Asia and all other members of the PTW Group, to the deal with MLS, which likewise committed itself and all of its affiliates. MLS had the actual or apparent authority to make this commitment and was the agent for all of its affiliates.

36. The MLS Agreement attached a list of essentially the same pieces of equipment in the same order as they were listed in the NXP Agreement. The price listed for each piece of equipment was based on the price listed in the NXP Agreement plus a markup that averaged 7.5%. Upon information and belief, MLS was fully aware of the NXP Agreement and that the vast majority of the money it would pay to PTW would be immediately transferred and flow directly to NXP.

37. NXP fulfilled all obligations and conditions precedent of the NXP Agreement.

38. PTW fulfilled all obligations and conditions precedent of the MLS Agreement.

39. MLS did not make the downpayment to PTW required by the MLS Agreement by the required deadline.

40. Thereafter, MLS abandoned the MLS Agreement.

41. Upon information and belief, MLS further failed to timely cure its breach despite being provided an opportunity to do so.

42. By not making the downpayment, by abandoning the deal, and by failing to timely cure its breach, MLS materially breached the MLS Agreement.

43. Similarly, PTR did not make the downpayment to NXP required by the NXP Agreement by the required deadline.

44. Thereafter, PTW abandoned the NXP Agreement.

45. PTW also failed to timely cure its breach despite being provided an opportunity to do so.

46. By not making the downpayment, by abandoning the deal, and by failing to timely cure its breach, PTW materially breached the NXP Agreement.

47. The direct connection between the NXP Agreement and MLS Agreement is undeniable. When MLS failed to fund the downpayment owed to PTW and thus materially breached the MLS Agreement, PTW in turn failed to fund the downpayment owed to NXP and thus materially breached the NXP Agreement.

48. PTW confirms this; in an undated letter to NXP on PTW Group letterhead, PTW blamed its inability to make the downpayment to NXP on MLS, stating "our customer has had to get additional approvals for funding."

49. The additional approvals for MLS funding never came.

50. Trying to make the deal work, NXP issued a total of four notices to PTW of availability of used equipment pursuant to the NXP Agreement.

51. PTW failed to fund those purchases and failed to take possession of the equipment.

52. Those failures were additional material breaches by PTW of the NXP Agreement.

53. Due to the failure of PTW and MLS to purchase the equipment as agreed, NXP was required to store the equipment at an offsite facility, resulting in NXP incurring monthly storage fees.

54. NXP has diligently worked to mitigate its damages. However, the demand for and value of the equipment at issue in the NXP Agreement has decreased significantly since the NXP Agreement was executed.

55. NXP ultimately sold the equipment on December 2, 2024 for $30,000,000 plus a contingent commission upon resale of between $4,000,000 and $18,500,000, for a total purchase price of between $34,000,000 and $48,500,000.

56. NXP has therefore lost money it should have received for the sale of that equipment; *i.e.*, the difference between the agreed price in the NXP Agreement and the price paid for the equipment by the ultimate buyer.

57. NXP has also lost money by having to store the equipment longer than it was required to do so under the NXP Agreement.

## V.   CAUSE OF ACTION ONE: BREACH OF CONTRACT AGAINST PTW

58. NXP incorporates by reference the preceding allegations as if fully set forth in this paragraph.

59. The NXP Agreement is a valid, enforceable contract between NXP and all PTW affiliates, including PTW America and PTW Asia.

60. NXP performed or tendered performance of its obligations under the Agreement, fulfilling all conditions precedent.

61. All PTW affiliates materially breached the Agreement as described above, including not making any payments to NXP under the terms of the NXP Agreement and by failing to mitigate its lack of payment.

62. As a direct and proximate result of PTW's breaches, NXP has suffered injury and substantial damages.

## VI.   CAUSE OF ACTION TWO: BREACH OF CONTRACT AGAINST MLS

63. NXP incorporates by reference the preceding allegations as if fully set forth in this paragraph.

64. NXP may recover directly against MLS for breach of the MLS Agreement because MLS and PTW intended to secure a benefit to NXP and they entered into the MLS Agreement for NXP's benefit.

65. NXP received more than an incidental benefit under the MLS Agreement, which was directly tied to the NXP Agreement. The timing of the execution of the MLS Agreement, the identical equipment list used therein, the available equipment procedures used therein, the substantive similarities with the NXP Agreement, and the fact the vast majority of the money paid thereunder would flow directly to NXP all clearly and fully express an intent to confer a direct benefit to NXP.

66. The MLS Agreement is a valid, enforceable contract between all PTW affiliates, including PTW America and PTW Asia, and all MLS affiliates, including MLS Corp.

67. The PTW affiliates performed or tendered performance of their obligations under the Agreement, fulfilling all conditions precedent.

68. The MLS affiliates materially breached the MLS Agreement as described above, including by not making any payments under the terms of the MLS Agreement and by failing to mitigate their lack of payments.

69. As a direct and proximate result of MLS's breach, NXP has suffered injury and substantial damages.

## VII. DAMAGES

70. NXP incorporates by reference the preceding allegations as if fully set forth in this paragraph.

71. As a proximate and producing cause of all claims asserted herein against PTW America, PTW Asia, and MLS, NXP has sustained losses and damages including, but not limited to, the benefit of its bargain (*i.e.* the difference between the agreed price in the NXP Agreement and the price paid for the equipment by the ultimate buyer) and storage costs for the unsold equipment. NXP further seeks all damages recoverable by law for the causes of action asserted, including without limitation its direct, indirect, consequential, special, incidental losses, lost profits and prejudgment and postjudgment interest.

## VIII. ATTORNEYS' FEES & COSTS

72. Pursuant to Section 38.001, *et seq.* of the Texas Civil Practice and Remedies Code, NXP seeks recovery of its reasonable and necessary attorneys' fees and costs incurred in prosecuting its claims against PTW America, PTW Asia, and MLS in this action.

73. NXP has fulfilled the requirement under that statute to be able to seek its attorneys' fees & costs in this action.

74. Namely, it is represented by an attorney, it presented a claim for payment to PTW, and PTW did not make payment within 30 days of that claim (no payment has been made at all).

## IX. JURY DEMAND

75. NXP requests a jury trial of all issues in this action and tenders the required fee with this petition.

## X. PRAYER

WHEREFORE, NXP respectfully requests the Court issue a judgment against PTW America, PTW Asia, and MLS for all of its damages; attorneys' fees and costs under Texas Civil Practice and Remedies Code § 38.001, *et seq.*; prejudgment and postjudgment interest as allowed by law; costs of suit; and all other relief, legal or equitable, to which NXP may show itself justly entitled.

Dated: July 11, 2025

NORTON ROSE FULBRIGHT US LLP

*/s/ Adam T. Schramek*
Adam T. Schramek
Texas Bar No. 24033045
adam.schramek@nortonrosefulbright.com
Ethan Glenn
Texas Bar No. 24101810
ethan.glenn@nortonrosefulbright.com
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255
Telephone:   (512) 474-5201
Facsimile:     (512) 536-4598

Joshua M. Taylor
Texas Bar No. 24139885
joshua.taylor@nortonrosefulbright.com
111 W. Houston Street
Suite 1800
San Antonio, TX  78205
Telephone:   (210) 270-7015
Facsimile:     (210) 270-7205

*Attorneys for Plaintiff NXP USA Inc.*